**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| **ABM Industry Groups, LLC,**<br>**Plaintiff,**<br>**v.**<br>**Done Right Building Services Inc.,**<br>**Defendant.** | **Civil Action No.**<br>**24-10503-NMG** |

**MEMORANDUM & ORDER**

**GORTON, J.**

ABM Industry Groups, LLC ("ABM" or "plaintiff") brings this suit against Done Right Building Services Inc. ("Done Right" or "defendant"), its longtime subcontractor, after Done Right outbid ABM for the 2023 Massachusetts Convention Center Authority ("MCCA") janitorial contract. ABM seeks payment of a $2,143,656 "development fee" under a subcontract agreement signed between the parties in 2013. Done Right responds that the subcontract agreement had lapsed by 2023 and, in any event, is unenforceable.

ABM asserts claims for breach of contract (Counts I-II), breach of the confidentiality provision (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), tortious interference with advantageous relations (Count V), and

violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A (Count VI).

Done Right counterclaims for a declaratory judgment that the 2013 subcontract did not apply to its 2023 conduct. ABM has now moved for summary judgment on liability under Counts I, II, and IV, on damages under Count II, and for judgment in its favor with respect to defendant's counterclaim. Done Right, in turn, has moved for summary judgment on every count and on its counterclaim.

For the reasons stated herein, both parties' motions are allowed, in part, and denied, in part.

## I. Facts

ABM provides janitorial and building-maintenance services nationwide. Effective January 1, 2017, its affiliate ABM Janitorial Services-Northeast, Inc. ("ABM Northeast") merged into ABM. Done Right disputes that the merger effected an "assignment" of the contracts of ABM Northeast but offers no evidence that the merger did not occur.

Done Right is a minority-owned Massachusetts janitorial company certified as a Minority Business Enterprise ("MBE"). Anthony Samuels is the President and Chief Executive Officer of Done Right, and Kenneth Martin is its Chief Operating Officer and Chief Financial Officer and was its Rule 30(b)(6) designee. Many public entities, including the MCCA, require that a portion

of their contract spending be directed to MBEs. ABM therefore partners with MBEs such as Done Right to bid on and perform such contracts.

**A. The Agreement**

ABM Northeast, the janitorial contractor for the MCCA, engaged Done Right to provide supplemental staff at the Boston Convention and Exhibition Center and the Hynes Convention Center (together, the "Convention Centers"). It also engaged Done Right for work at the Massachusetts Bay Transportation Authority ("MBTA") and Northeastern University ("Northeastern"). Although the parties dispute whether the engagement began in 2010 or 2012, they agree that it was initiated without a written agreement.

In 2013, ABM Northeast required Done Right to execute a form "Janitorial Services Subcontract Agreement" ("the Agreement"), effective June 1, 2012. Samuels testified that he understood the Agreement "was to cover the Convention Center."

Section 1 defines the "Services" to be performed by Done Right as those described in the attached exhibits and schedules, but none were ever attached. The parties instead negotiated rates annually through separate pricing proposals. Section 1(b) provides:

> The terms and conditions of this Agreement shall apply to all service agreements, exhibits, schedules, supplements, or amendments attached hereto, executed or agreed to by the

> Parties, including any future service agreements executed by the Parties unless this Agreement is terminated or it is agreed to in writing otherwise.

The Agreement may be terminated in several ways. Under §3, the Agreement shall continue in full force until it is either 1) cancelled by either party as provided by the Agreement or 2) terminated as a result of notice given to ABM by one of its customers and subsequent notice to Done Right, whichever occurs first.

Section 14 permits either party to terminate the Agreement without cause. ABM may do so: 1) if it gives ten days' written notice to Done Right 2) immediately if it receives less than ten days' notice that one of its customers is terminating its contract with ABM or 3) if ABM or the customer is dissatisfied with the services of Done Right.

Done Right may terminate the Agreement without cause upon 60 days' written notice to ABM. If Done Right gives less than 60 days' notice, it is liable for liquidated damages equal to its last full monthly invoice "for the terminated location."

Section 15 permits ABM, but not Done Right, to terminate the Agreement immediately for cause, for, among other things:

> diversion or attempt to divert business or patronage from a[n] [ABM] Customer [§15.9] or
>
> receipt of notice that Customer requests that [Done Right] cease performance of Services at a Customer location(s) [§15.10].

Termination does not release either party from its rights or obligations accrued before termination (§16.3). Several provisions contemplate termination as a result of ABM's interaction with its customers. See §§14, 16, 17.

Section 35 requires that any notice be in writing and delivered to the designated representative by registered or certified mail or by overnight courier with tracking confirmation. Neither party has ever given written notice of termination of the Agreement under §14 or §15.

Section 24 prohibits Done Right, during the term of the Agreement, from seeking to

> [d]ivert or attempt to divert any of the business or patronage from any [ABM] Customer.

It also prohibits Done Right from disclosing confidential information to any third party and from interfering with the relationships of ABM with its employees and customers.

Under §25, Done Right acknowledges that its opportunity to perform services resulted from the customer relationships of ABM and not as a result of any actions on its own part. Defendant further agrees that, during the term and for one year after termination, it will not

> solicit, employ, hire or engage any person who is or was a non-union employee, agent or representative of [ABM] or Customer in any capacity or solicit or respond to a Customer pricing request for any [ABM] Customer for whom [Done Right] has or is providing Services under this Agreement.

Done Right also agrees not to bid on or respond to a request for proposals from any such customer. Section 25 further provides that if, within one year after termination of the Agreement, Done Right performs similar services for an ABM customer, it

> shall pay [a] development fee [equal to] 3 times the monthly amount agreed to be paid by the Customer to [Done Right] . . . for such services.

The prohibitions in §25 thus apply both during and for one year after termination of the Agreement but the development fee is payable only for services performed within one year after termination.

Section 27 requires that any modification, extension or addition to the contract be in writing and signed by the parties. Section 29 provides that confidential information, whether or not marked as such, may not be disclosed to third parties or used for any purpose without ABM's prior written consent. Section 32 directs that 1) the failure of ABM to require performance shall in no way affect its full rights to require such performance at any time thereafter, and 2) a waiver by ABM of one breach does not constitute a waiver of any future breach. Finally, Section 37 notes that neither party may rely on any agreement or understanding not expressly set forth in the Agreement unless it is in writing and signed by both parties.

**B. Performance**

From 2012 through 2023, ABM used Done Right staff whenever events at the Convention Centers required them. Done Right has also performed services for ABM at the MBTA without interruption since 2012. ABM contends that all of that work was performed under the Agreement but Done Right rejoins that, after 2017, the parties operated on a separate purchase-order and invoice basis, despite ABM's assertion that no purchase orders were ever issued.

In April, 2017, the MCCA awarded ABM a new contract for a term of three years plus two option years and Done Right continued as ABM's subcontractor. The Agreement was never amended to refer to the new contract. In August, 2017, ABM sent Samuels a copy of the Agreement, receipt of which Samuels acknowledged but the parties dispute whether he requested that copy or ever concurred that the Agreement remained in effect.

The COVID-19 pandemic halted events at the Convention Centers. Defendant performed no work there from March 2020 until late 2021, although it continued to serve plaintiff at the MBTA. The MCCA extended its contract with ABM without soliciting new bids, and neither party invoked the force majeure clause of the Agreement.

Martin, testifying as defendant's Rule 30(b)(6) designee, agreed that the company's conduct during 2020 and 2021

demonstrated that it intended to continue performing services at the Convention Centers as a subcontractor for ABM as soon as the government shutdowns were lifted.

During that period, Done Right repeatedly requested a new subcontract agreement. In early 2020, Martin asked ABM to execute a new contract agreement in connection with an extension of ABM's MBTA contract. Larry Pestana, regional operations director for ABM, asked what Martin meant by an updated contract to which Martin replied, "This is the last contract I have on file [and] it is seven years old." In November 2020, responding to a request concerning the MBTA work, Pestana wrote, "I'm sorry Kenneth. I'll get it to you this week." No new agreement was ever executed.

Done Right contends that Martin told the ABM representative that Done Right considered the Agreement expired, citing Martin's deposition, but it identifies no written communication to that effect before ABM's December 2023 demand. ABM asserts that it regarded the existing Agreement as remaining in effect.

In 2022, Done Right informed ABM that it intended to bid on work at Northeastern, with which Done Right had an independent relationship. After review by its senior management and legal team, ABM neither objected nor made reference to the Agreement. Done Right was awarded a portion of that work but ABM retained the majority. It did not pursue litigation, apparently having

concluded that, because it had retained most of the Northeastern work, the anticipated legal fees would outweigh any benefit.

**C. The 2023 MCCA Bid**

In August, 2023, the MCCA issued a Request for Qualifications and a Request for Proposals. Done Right had been preparing to bid for several months. Shortly thereafter, it informed ABM that it would submit a competing bid if deemed qualified. Pestana relayed that information to the General Counsel of ABM. ABM raised no objection at the pre-bid conference held by the MCCA, which both companies attended. On September 22, 2023, Pestana asked Done Right about its plans, and a Done Right representative replied that it was awaiting the results of the qualification process.

In October, 2023, after the MCCA deemed it qualified, Done Right confirmed that it would submit a bid. Pestana at ABM replied: "No worries understood. Thank you." He testified that he intended only to acknowledge receipt of the message and that ABM had not objected earlier because it did not expect Done Right to qualify. Done Right subsequently told Pestana that it would still want to partner with ABM if its bid were unsuccessful.

Martin stated that in preparing the bid he relied on his industry-wide knowledge, public documents and information provided by the MCCA. Defendant maintains that he did not rely

on any confidential information belonging to plaintiff. ABM disputes that account and contends that Done Right's bid was viable only because Done Right knew, from its work as subcontractor, how much revenue ABM earned beyond the base contract, principally from additional hours billed to event and exposition sponsors.

ABM submitted its bid on October 25, 2023, listing Done Right as its MBE subcontractor. Done Right submitted the lowest-priced bid and ABM submitted the second-lowest. On November 9, 2023, an MCCA committee selected Done Right which it attributes to complaints about ABM's performance and the MCCA's treatment of MBEs. ABM disputes both points.

Before Done Right began to work with the MCCA under its new contract on January 1, 2024, ABM terminated several workers at the Convention Centers. Done Right hired three of ABM's non-union site managers: Pimentel, Coleta and Palmieri but asserts that ABM had already slated Pimentel and Coleta for termination and that the MCCA asked Done Right to retain the existing management team. ABM concedes that it intended to terminate Pimentel but disputes that any of the three had been terminated at the time Done Right solicited them. ABM does not dispute that the MCCA requested Done Right to retain ABM's team.

Notwithstanding ABM's contention that the Agreement has never been terminated, in December, 2023, it demanded in

writing, that Done Right pay the "development fee." Done Right promptly responded in writing and refused to do so, asserting that 1) the Agreement had expired or been abandoned, 2) ABM had waived or was estopped from enforcing the restrictive covenants, and 3) in any event, those covenants violated public policy. Neither communication purported to give notice of termination under §14 or §15, and neither appears to have been delivered in the manner §35 requires.

Done Right was paid $8.5 million during its first 12 months under the new MCCA contract. On the basis of those gross receipts, ABM calculates the development fee to which it is entitled at just over $2.1 million. Done Right disputes both that it owes any development fee and ABM's calculation of what it should be. According to Martin, Done Right's "margin" on the new contract is approximately 5%, and it earned roughly $400,000 in profit on that contract in 2024.

Done Right continues to perform services for ABM at the MBTA and ABM contends that the Agreement continues to govern that work. More than once, procurement staff for ABM has asked Done Right to execute a current standard subcontractor agreement. The April, 2026 request stated, "If you already have an executed [Master Janitorial Services Agreement], please send over for review." Done Right has not done so.

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." A dispute is genuine if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If the movant carries its burden, the nonmovant must set forth specific facts showing a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court views the record in the light most favorable to the nonmovant and draws all reasonable inferences in its favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). On cross-motions, the Court considers each motion separately, drawing inferences against each movant in turn. See Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

The Agreement purports to be governed by the laws of the state in which the services are performed (see §34), which, here, is Massachusetts.

## III. Discussion

### A. Breach of Contract (Counts I and II)

To prevail on a claim for breach of contract under Massachusetts law, a plaintiff must establish that 1) the parties reached a valid agreement supported by consideration, 2) the plaintiff was ready, willing and able to perform, 3) the defendant breached the agreement and 4) the plaintiff sustained damages as a result. Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016).

Done Right does not dispute that ABM performed its part of the bargain but contends that 1) ABM may not enforce the Agreement, 2) the Agreement did not govern its 2023 conduct and 3) the restrictive covenants are unenforceable. In the alternative, Done Right asserts waiver and estoppel and that the development fee is an unenforceable penalty.

After careful consideration, the Court concludes that 1) there was a valid contract, 2) ABM may enforce the Agreement, 3) the Agreement governed the work of Done Right for the MCCA in 2023 and 4) the restrictive covenants are enforceable as applied. Done Right is liable for breach of the contract.

More specifically, the Court finds that defendant is liable for a hiring-related breach of contract but that a genuine dispute of material fact as to its affirmative defense of waiver precludes summary judgment on liability for the bid-related

breach. The Court will reserve its ruling on the development fee pending supplemental briefing.

1. Enforcement of the Agreement

Done Right argues that ABM lacks standing to enforce the Agreement because ABM Northeast, not ABM, was the contracting party. ABM is a Delaware limited liability company. Under Delaware law, when a merger takes effect, all of the rights, privileges and powers of each constituent entity are vested in the surviving entity as a matter of law. Del. Code Ann. tit. 6, §18-209(g). The surviving entity may therefore enforce the contracts of its predecessor, including restrictive covenants. See U.S. Sec. Assocs., Inc. v. Parretti, 405 F. Supp. 3d 328, 332 (D. Mass. 2019) (applying Massachusetts law). Because Done Right offers no evidence that the merger did not take effect, ABM is entitled to enforce the Agreement.

2. Interpretation of the Agreement

Done Right concedes that the Agreement was supported by consideration and its Chief Executive Officer testified that he understood his signature bound Done Right. The Agreement itself recites that it "is a legally binding contract [and that each party] has had the opportunity to consult with legal counsel of choice." (§37). The parties then performed under the Agreement for more than a decade.

That §1 refers to exhibits and schedules that were never attached does not negate a meeting of the minds. Nor does it establish that their attachment is a condition precedent to the effectiveness of the Agreement. Whether a provision creates a condition precedent turns on the intent of the parties. Mass. Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45-46 (1991). "Emphatic words" are generally necessary to create a condition precedent that will limit or forfeit rights. Absent such language, a condition precedent will be found only where the intent of the parties to create one is clearly manifested from the contract as a whole. Id. at 46.

Section 1 contains no such condition, and nothing in the Agreement suggests that the parties intended the attachment of schedules to be a prerequisite to its validity. The record instead indicates that the matters the schedules would have addressed, principally rates, were set through annual pricing proposals.

The "attached exhibits and schedules" language in §1, moreover, limits the extent to which Done Right is bound by the Customer Contract, i.e., the contract between ABM and its customer. It does not, however, limit the obligations of Done Right under the terms of the Agreement itself, including the restrictive covenants of §§24 and 25. Section 36, in turn, incorporates by reference "[a]ll exhibits, schedules,

supplements and amendments to this Agreement . . . whether or not specifically mentioned herein."

Section 1(b) also extends the Agreement to

> all service agreements . . . executed or agreed to by the Parties, including any future service agreements [unless the parties agree] in writing otherwise.

Those "service agreements" are accords between ABM and Done Right, such as the annual pricing proposals, not the contract between ABM and the MCCA. That Done Right never executed the 2017 MCCA contract is therefore immaterial.

For the same reason, contrary to what Done Right asserts, the operative effect of the Agreement after 2017 required no signed modification, extension or addition under §27. Under §1(b), a signed writing was required to exclude the later work, not to include it. The Court need not decide whether the Agreement extended to all customers of ABM because Samuels testified that the Agreement "was to cover the Convention Center," and that is sufficient for the case at bar.

With respect to the duration of the Agreement, under §3 the Agreement continues in effect until cancelled by a party or "terminated by the Customer by notice to [ABM] and subsequent notice to [Done Right]." No party gave written notice of termination under §14 or §15 and no notice from the MCCA under §3 appears in the record. The expiration of the original MCCA contract in 2017 did not constitute a termination under the

Agreement. The MCCA awarded a new contract to ABM as incumbent and ABM, with Done Right as its subcontractor, continued to serve the MCCA without interruption from 2016 through 2023.

Whether the termination of the customer relationship between ABM and the MCCA at the end of 2023 caused a termination of the Agreement is a different question. The Court concludes only that the Agreement was not terminated before Done Right bid on the MCCA contract. Whether the Agreement was terminated thereafter bears upon the development fee and is addressed in Part C below.

Nor is there evidence that the parties abandoned the Agreement. A writing requirement, as is included in the Agreement, may be negated where the conduct of the parties demonstrates mutual agreement to depart from the written terms. Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992). For abandonment to be implied from conduct, however, the actions of the parties must be "positive and unequivocal" and must reflect the intent of both parties. Drake Boatbuilding Co. v. Davenport, 83 Mass. App. Ct. 1107 (2013) (Rule 1:28 decision) (quoting 29 Williston, Contracts §73.16 (4th ed. 2003)).

The undisputed conduct of the parties contradicts abandonment. As noted above, Martin agreed that the conduct of Done Right during the pandemic demonstrated that it intended to continue performing services at the MCCA as a subcontractor to

ABM. Done Right then resumed that work and continued to serve ABM at the MBTA throughout the relevant time frame.

Furthermore, none of the evidence Done Right proffers reflects any intent to abandon the Agreement. Done Right's 2020 request for a new or updated contract presumes that one existed at that time. The November, 2020 response by Pestana anticipated paperwork concerning the MBTA work performed by the parties but not abandonment of the Agreement. Moreover, the 2025 and 2026 procurement emails, sent after the alleged breach, asked Done Right to forward "an executed MSA" if it had one. ABM attributes those requests to a gap in its own records but they do not suggest that either party regarded the Agreement as abandoned in 2023. Finally, ABM's failure to object to defendant's Northeastern bid bears on waiver, not abandonment.

Accordingly, the Agreement controlled the work of Done Right for the MCCA in 2023.

3. Enforceability of the Restrictive Covenants

A restrictive covenant is enforceable if it is necessary to protect a legitimate business interest, reasonably limited in time and space and consonant with the public interest. Automile Holdings, LLC v. McGovern, 483 Mass. 797, 808 (2020). Covenants between commercial entities are reviewed "less critically" than those restricting individual employees. Such covenants do not implicate the right of an individual to earn a living and

generally arise between parties of comparable bargaining power. Boulanger v. Dunkin' Donuts Inc., 442 Mass. 635, 639, 641 (2004).

a) Legitimate Business Interest

Legitimate business interests include the protection of trade secrets, confidential information and goodwill. Id. at 641. Done Right suggests that ABM lacks a legitimate business interest to enforce the restrictive covenants for two reasons: 1) because a public entity such as the MCCA must treat all bidders equally, and thus, no contractor can develop goodwill with just one; and 2) there is no evidence that Done Right used the confidential information of ABM.

The second argument conflates enforceability with breach. The enforceability of a covenant depends on whether it protects a legitimate business interest, not on whether a particular misuse of information can be proved. Indeed, a restrictive covenant is warranted precisely where misuse of confidential information is likely "yet it might be impossible to detect or prove." Boulanger, 442 Mass. at 643 n.12.

As subcontractor for ABM at the Convention Centers, Done Right was uniquely positioned to observe ABM's operations, including staffing and event-driven demand. A competing bidder would value such information whether or not the public entity awards its contracts based on price alone. A covenant that

protects against the misuse of such information by a subcontractor protects a legitimate interest.

The Court need not therefore decide whether a contractor may hold protectable goodwill with a public body bound by competitive-bidding requirements.

b) Reasonableness of Scope and Duration

Done Right contends that the covenants lack defined limits and, as construed by ABM, would bind Done Right indefinitely. The Court disagrees.

The covenants apply only to customers for which Done Right performed services under the Agreement and to non-union employees of ABM. They remain in effect for the term of the Agreement and, by virtue of §25, for one year thereafter. See Boulanger, 442 Mass. at 643 (upholding an in-term covenant that continues for two years thereafter); Sentient Jet, LLC v. Early, 2013 WL 6210643, at *4 (D. Mass. Sept. 11, 2013) (holding that a restriction tied to the customers with which a party worked supplies a reasonable territorial limit). If the Agreement terminated when the contract between the MCCA and Done Right became effective on January 1, 2024, the post-termination restrictions in §25 would have run through December 31, 2024.

Moreover, the subject term of the Agreement was within the control of Done Right. It could have terminated the Agreement for convenience upon 60 days' written notice and competed freely

one year later. That the covenants remained in force in 2023 reflects the considered decision of Done Right to continue performing under the Agreement.

The Court acknowledges that the prohibition in §25 against hiring any person "who is or was a non-union employee" of ABM is unduly broad but, as applied here, it applies only to the hiring by Done Right of three site managers employed by ABM at the Convention Centers. Such application pertains directly to the legitimate purpose of the covenant and the Court will enforce it to the extent it is reasonable. See All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974).

c) Public Policy

Done Right principally contends that the restrictive covenants violate the public policy underlying the competitive-bidding laws of the Commonwealth because they penalize a qualified bidder for competing for a public contract. See Datatrol, Inc. v. State Purchasing Agent, 379 Mass. 679, 697 (1980); Interstate Eng'g Corp. v. Fitchburg, 367 Mass. 751, 758 (1975). No Massachusetts appellate decision appears to address that question.

Most of the authorities on which Done Right relies concern bid-rigging, agreements among competing bidders to suppress competition or a departure by a public body from mandatory bidding procedures. See, e.g., Interstate Eng'g, 367 Mass. at

757-58; Hardison v. Reel, 70 S.E. 463, 463-465 (N.C. 1911).[1] Those authorities do not hold that an ancillary restraint between a prime contractor and its subcontractor is void as a matter of law where the restraint is premised on protecting the confidential information of the prime contractor.

Courts in other jurisdictions have enforced such restraints, even as applied to public contracts, absent collusion, fraud or monopolization. See Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc., 424 S.C. 444, 459-60 (2018); Preferred Sys. Sols., Inc. v. GP Consulting, LLC, 284 Va. 382, 392-94 (2012); Vernon v. Lopez, No. 23313-4-II, 2000 WL 264369, at *7 (Wash. Ct. App. Mar. 3, 2000).

As applied here, enforcement of the restrictive covenants does not offend the public policy that Done Right invokes. ABM did not seek to enjoin Done Right from bidding. Rather, it seeks compensation if and when Done Right breaches the Agreement. Indeed, when the MCCA solicited bids, Done Right submitted one and was awarded a contract which remains in effect. The MCCA thus enjoyed the competition that the bidding laws are designed to secure.

---

[1] Collaborative Student Transp. of Minn., LLC v. e-FFicient Sch. Transp., LLC, 2021 Minn. Dist. LEXIS 1110 (Minn. Dist. Ct. 2021), which involved a restrictive covenant, arose from an effort to enjoin competitors from bidding, relief ABM does not seek here.

The Court acknowledges that §25 also prohibits Done Right from bidding outright. Although an injunction enforcing that prohibition would exclude a qualified bidder from a public procurement, under the circumstances of this case, it may be permissible. The prohibition is ancillary to a legitimate subcontracting relationship and protects the confidential information of the prime contractor. See Palmetto Mortuary, 424 S.C. at 459-60; Preferred Sys. Sols., 284 Va. at 392-94. Furthermore, Done Right could have terminated the Agreement on 60 days' written notice and bid freely one year later. In any event, that question is not before the Court. As applied to a claim for compensation after a completed procurement, the restrictive covenants are enforceable.

4. Breach

Done Right concedes that, if the Agreement remains in effect, its conduct constitutes a breach. By bidding on the MCCA request for proposal, Done Right violated the bidding prohibition in §25 (Count II), and by obtaining the contract, it diverted the business of the MCCA in violation of §24 (Count I). To the extent Count I alleges that Done Right used the confidential information of ABM, it is deficient because §24 prohibits only disclosure of such information to third parties which is addressed hereafter with respect to Count III.

Furthermore, by hiring three non-union managers employed by ABM, Done Right also violated the hiring prohibition in §25 and interfered with the plaintiff's relationship with its employees in violation of §24. Even assuming that two of those managers had been slated for termination, that fact does not negate a breach of contract because §25 bars hiring any person who "is or was" a non-union employee of ABM. The prospective termination may, instead, bear upon damages.

Each breach of contract by defendant occurred during the term of the Agreement. Done Right submitted its bid in October, 2023 and hired ABM's three managers before January 1, 2024. Liability for those breaches therefore does not depend upon whether or when the Agreement was subsequently terminated.

**B. Waiver and Estoppel**

Done Right contends that ABM waived the restrictive covenants or, alternatively, is estopped from enforcing them but does not seek summary judgment on that ground.

Waiver is the intentional relinquishment of a known right. Waiver may be express or implied from conduct but it must be established by "clear, decisive and unequivocal conduct" for which "no other reasonable explanation . . . is possible." KACT, Inc. v. Rubin, 62 Mass. App. Ct. 689, 695 (2004).

Waiver is ordinarily a question of fact and may be resolved on summary judgment only when the material facts are undisputed

and "only one possible inference" may be drawn from them. Dynamic Mach. Works, Inc. v. Mach. & Elec. Consultants, Inc., 444 Mass. 768, 773 (2005). An anti-waiver clause, such as the one included in the Agreement, is a relevant but not dispositive factor. See M.J.G. Props., Inc. v. Hurley, 27 Mass. App. Ct. 250, 252 (1989).

The decision by ABM not to contest the bid by Done Right for maintenance services at Northeastern does not, as a matter of law, waive ABM's rights with respect to the MCCA. Section 32 provides that a waiver by ABM of a breach of any provision of the Agreement "shall not constitute a waiver of any future breach."

The Northeastern bid involved a different customer, one with which Done Right had an independent relationship, and ABM retained the majority of that work. Whatever ABM intended by forgoing enforcement of the Agreement as to that breach did not jeopardize its right to recover for a later breach involving a different customer.

Nor is ABM estopped by its 2020 response to the request by Done Right for a new agreement. Estoppel requires a representation intended to induce reasonable reliance on the representation and resulting detriment. Turnpike Motors, Inc. v. Newbury Grp., Inc., 413 Mass. 119, 123 (1992).

At no point did ABM concur that the Agreement was void. Done Right's managers are sophisticated commercial businessmen and §37 provides that

> [n]either Party shall be entitled to rely on any agreement, understanding or arrangement which is not expressly set forth in this Agreement . . . unless such agreement is in writing and signed by both Parties.

Done Right cannot therefore reasonably rely on an unwritten understanding that the Agreement lapsed.

The October 12, 2023 exchange, however, presents a different quandary. A reasonable factfinder could conclude that ABM knowingly elected not to assert its rights with respect to the bid by Done Right for the MCCA contract.

ABM's General Counsel learned of the prospective bid in August, 2023. An ABM representative attended the pre-bid conference without objection. Pestana had discussions with Done Right on September 22 and again on October 12. When Done Right confirmed that it would bid, Pestana replied, "No worries understood. Thank you." Pestana testified that ABM had refrained from objecting because it did not expect Done Right to qualify.

The evidence of non-waiver offered by ABM is substantial. The statement by Pestana that he had "no worries" about the bid is consistent with an intent to seek compensation rather than to block a qualified bidder, and ABM demanded a development fee

promptly after the award. Done Right had been preparing its bid for months and it later told Pestana that it hoped to partner with ABM if its bid failed.

The weighing of conflicting evidence is, however, for the jury. Because more than one reasonable inference may be drawn from the October, 2023 exchange and its context, the Court cannot resolve the defense of waiver as a matter of law.

The October, 2023 correspondence concerned only the bid submitted by Done Right. It has no bearing on the subsequent hiring by Done Right of managers employed by ABM. Accordingly, summary judgment for ABM will be denied as to liability for the bid-related breach but allowed as to liability for the hiring-related breach.

**C. Remedies**

ABM seeks to recover a development fee under §25. That provision does not make the fee payable upon a breach of contract but provides that if, within one year after termination of the Agreement, Done Right performs similar services for an ABM customer, Done Right "shall pay" a development fee equal to three times the monthly amount the customer agreed to pay for defendant's services.

The Court has concluded that the Agreement was not terminated before Done Right's 2023 bid and neither party has addressed whether, or when, it was terminated along with the

customer contract with the MCCA. ABM maintains that the Agreement has never been terminated while Done Right contends that it expired in 2017, a contention the Court has rejected. The record contains no notice of termination under any of the relevant sections of the Agreement (§§3, 14, 15 or 17).

ABM did not exercise its right under §15.9 to terminate the Agreement upon the diversion by Done Right of the business of the MCCA. It instead demanded payment of the development fee and continued to engage Done Right at the MBTA. If the Agreement has not been terminated, the condition precedent for the development fee is absent, and ABM is limited to actual contract damages.

The parties also dispute the amount of the fee to be paid. ABM averages Done Right's first-year monthly billings to the MCCA but Done Right disputes that the average is the "monthly amount agreed to be paid by the Customer." Done Right's own billing summary reports roughly $8.5 million in 2024 revenue from the MCCA, exclusive of amounts billed to third parties for exposition events, a figure that does not match the gross billings on which ABM relies.

The Court will therefore entertain supplemental briefing on that issue and reserves its ruling on Done Right's contention that the fee is an unenforceable penalty. In any event, whether Done Right is liable for the bid-related breach will depend upon

the resolution of its affirmative defense of waiver at trial. ABM's motion for summary judgment as to damages on Count II will therefore be denied. If the development fee is not recoverable and Done Right's affirmative defense of waiver is overruled, ABM may pursue actual damages for the bid-related breach in lieu of the development fee.

With respect to the hiring-related breach, Done Right contends that ABM suffered no damages because two of the managers had already been slated for termination. ABM demurs. Whether, and to what extent, ABM was harmed is a question of fact for trial. Moreover, a plaintiff who establishes a breach of contract is entitled to at least nominal damages. See Flynn v. AK Peters, Ltd., 377 F.3d 13, 23 (1st Cir. 2004). Done Right's motion for summary judgment on that claim will therefore be denied.

**D. Confidential Information (Count III)**

Section 29 of the Agreement provides that

> client information, specifications, pricing, key personnel, [and] production rates . . . may be confidential whether or not identified or marked as confidential [and] shall not be disclosed to any third party or used for any purpose without Contractor's prior written consent.

ABM asserts that Done Right breached that obligation by using ABM's wage rates, hour calculations, staff lists, plans, business strategies and procedures for responding to the requests for proposals from the MCCA, including information

concerning the additional hours charged to event and exposition sponsors, to prepare its MCCA bid. Done Right denies using such information and moves for summary judgment on Count III.

Because ABM bears the burden of proof at trial, it must elicit "evidence affirmatively tending to prove" that Done Right used its confidential information. FDIC v. Elder Care Servs., Inc., 82 F.3d 524, 526 (1st Cir. 1996).

Done Right contends that the information at issue was not confidential because it 1) belonged to the MCCA, 2) was subject to the public records law and 3) was not protected by secrecy measures. The Court need not resolve this issue because, even assuming that such information was confidential, ABM has produced no evidence that Done Right used the information.

Martin, testifying as Done Right's designee, stated that in preparing the bid he relied on his industry-wide knowledge, public documents and information provided by the MCCA. ABM responds that Done Right had access to its operational data, pricing structures and staffing models throughout the subcontracting relationship, and it cites deposition testimony that it characterizes as significant circumstantial evidence of use by the defendant.

Evidence of access is not, however, evidence of use. ABM asks the Court to infer misuse on the basis of circumstantial evidence. *See* Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159,

169 (1979). It professes that the margins claimed by Done Right are commercially irrational absent knowledge of the revenue ABM generated from exposition staffing and that Done Right's bid "adopted the same economic framework" as its own. ABM offers no comparison of the two bids, however, and no evidence that Done Right's bid depended on revenue beyond the base contract or that it was priced below cost.

Done Right staffed events at the Convention Centers for a decade. Knowledge acquired by performing that work is not, without more, evidence of misuse of the prime contractor's confidential analysis.

Because such misuse might be impossible to detect or prove, Boulanger, 442 Mass. at 643 n.12, the enforcement of restrictive covenants is justified. That does not, however, relieve ABM of its burden to prove breach of a confidentiality obligation. On this record, a finding of misuse would rest on speculation. See Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017). The Court will not do so and therefore Done Right's motion for summary judgment as to Count III will be allowed.

**E. Implied Covenant of Good Faith and Fair Dealing (Count IV)**

Every contract carries an implied covenant that

> neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014). The covenant does not create rights or duties beyond those the contract already provides. Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 289 (2007). A lack of good faith may be inferred from the totality of the circumstances. T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010).

Done Right offers no argument directed specifically at Count IV. It relies instead on its contention that the Agreement did not apply to its conduct in 2023, which the Court has rejected. Done Right's motion for summary judgment as to Count IV will therefore be denied.

ABM is likewise not entitled to summary judgment on Count IV. It contends that Done Right acted opportunistically in two respects: 1) Done Right retained the benefits of the subcontracting relationship while preparing to displace ABM and 2) it waited until five working days before bids were due to disclose its intent to bid, leaving ABM no time to secure another MBE partner.

The timing of disclosure is disputed. ABM's own statement of facts acknowledges that Done Right disclosed its plan to bid in late August, 2023. Done Right cites evidence that ABM listed Done Right as its MBE subcontractor in its own bid while arranging for a replacement, All Time Services.

Whether Done Right's conduct comported with the parties' reasonable expectations under the Agreement thus turns on disputed facts about the knowledge, timing and motives of both parties. Because a lack of good faith can be inferred from the totality of the circumstances, T.W. Nickerson, 456 Mass. at 570, those questions cannot be resolved on summary judgment. ABM's motion as to Count IV will therefore be denied.

### F. Tortious Interference with Advantageous Business Relations (Count V)

ABM declares that Done Right tortiously interfered with its relationships with the MCCA and with its employees. To prevail on such a claim, a plaintiff must prove that 1) it had a business relationship or contemplated contract of economic benefit, 2) the defendant knew of the relationship, 3) the defendant interfered with that relationship through improper motive or means and 4) the plaintiff lost an advantage as a direct result. Blackstone v. Cashman, 448 Mass. 255, 260 (2007).

The interference must be improper in some respect beyond the interference itself. Pursuit of legitimate economic interests through ordinary competition is not improper. See United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816-17 (1990).

The sole theory of improper means advanced by ABM, both in its complaint and in its opposition to defendant's motion for

summary judgment, is that Done Right misappropriated its confidential information. Because ABM has produced no evidence that Done Right used that information, the remaining described conduct simply amounts to competition. Done Right bid openly for a public contract after disclosing its intent to ABM. It allegedly hired the site managers employed by ABM, at the request of the MCCA, only after Done Right was awarded the new contract.

ABM identifies no evidence of threats, misrepresentation, or any motive other than the economic interest of Done Right. Whatever liability that conduct elicits under the Agreement, it does not constitute improper motive or means. Summary judgment in Done Right's favor will therefore be allowed as to Count V.

### G. Chapter 93A (Count VI)

ABM also asserts that the 2023 conduct of Done Right violated M.G.L. c. 93A ("Chapter 93A"). The statute prohibits

> [u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

M.G.L. c. 93A, §2. A mere breach of contract, without more, does not violate the statute. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-01 (1979). A knowing breach may support liability, however, where it is used as leverage to extract a benefit to which the breaching party is not entitled.

See Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991).

ABM's Chapter 93A claim is based upon Done Right's alleged misappropriation of its confidential information. In opposing defendant's motion for summary judgment, ABM relies on three grounds: 1) the solicitation by Done Right of the MCCA contract and ABM's employees, 2) the misappropriation of ABM's confidential information and 3) Done Right's "overall course of conduct." ABM contends that the factual disputes that preclude summary judgment on its confidentiality claim preclude summary judgment on its Chapter 93A claim as well.

As explained above, however, ABM has produced no evidence that Done Right used its confidential information. What remains is a claim for breach of contract, which alone cannot sustain a Chapter 93A claim. Whitinsville Plaza, 378 Mass. at 100-01.

Even viewing the disputed evidence concerning the timing of the disclosure by Done Right in ABM's favor, nothing in the record suggests deception, coercion or the use of its breach as leverage against ABM. See Anthony's Pier Four, 411 Mass. at 474. Done Right's motion for summary judgment with respect to Count VI will therefore be allowed.

### H. Declaratory Judgment

Done Right's counterclaim seeks a declaratory judgment that the Agreement did not apply to its 2023 conduct and is

unenforceable. The Court has rejected those contentions. ABM's motion for summary judgment on the counterclaim will therefore be allowed and, conversely, Done Right's motion will be denied. The Court's ruling will not, however, determine whether the Agreement was terminated after Done Right's bid, which will be the subject of supplemental briefing. The portion of the counterclaim that relates to Done Right's affirmative defenses of waiver and estoppel will, however, be dismissed as redundant.

**ORDER**

For the foregoing reasons,

A. the motions of plaintiff ABM ("ABM") for partial summary judgment on its affirmative claims (Docket No. 50) and summary judgment on the counterclaim of Defendant Done Right ("Done Right") (Docket No. 51) are, with respect to:

   1) the right of ABM to enforce the Janitorial Services Subcontract Agreement ("the Agreement"),

   2) the application of §§24 and 25 to the conduct of Done Right and the enforceability of those provisions as applied,

   3) the liability of Done Right for the hiring-related breach under Counts I and II, and

4) Done Right's counterclaim, except as provided in Paragraph B

**ALLOWED**, but with respect to:

1) liability of Done Right for the bid-related breach under Counts I and II,

2) damages under Count II, and

3) Count IV,

**DENIED**.

B. the portion of Done Right's counterclaim relating to its affirmative defenses of waiver and estoppel is **DISMISSED** as duplicative.

C. the motion of Defendant Done Right for summary judgment (Docket No. 55) is, with respect to Counts III, V and VI, **ALLOWED**, but otherwise **DENIED**.

The Court reserves its ruling on defendant's contention that the development fee is an unenforceable penalty.

Within 14 days of the date of this Order, the parties shall submit supplemental memoranda, not to exceed 10 pages, addressing:

1) whether, in light of plaintiff's contention that the Agreement has not been terminated, a development fee pursuant to §25 is payable under any circumstances;

2) whether the expiration of ABM's MCCA contract on December 31, 2023 constitutes a termination of the Agreement under §3 or otherwise;

3) if the development fee is payable, whether it constitutes liquidated damages or an alternative performance obligation and, if the former, whether it is an unenforceable penalty; and

4) how to determine the "monthly amount agreed to be paid by the Customer" under §25, including whether revenue billed to third parties for exposition events is included and the source of the $8,574,625 figure on which ABM relies.

**So ordered.**

Nathaniel M. Gorton
Nathaniel M. Gorton
Senior United States District Judge

Dated: October 30, 2026